**In re John R. REED, Debtor.**

**John R. Reed, Plaintiff,**

**v.**

**Norwest Mortgage, Inc., Defendant.**

**Bankruptcy No. 99–33023DAS.
Adversary No. 00–130.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

April 25, 2000.

---

Thu B. Tran, Delaware County Legal, Assistance Assoc., Chester, for Debtor.

Stuart Winneg, Mark J. Udren & Assoc., Cherry Hill, NJ, for Defendant Norwest Mortgage, Inc.

Edward Sparkman, Phila., for Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant Proceeding ("the Proceeding") presents the significant legal question of whether the presence of a clause in a mortgage expressly stating that funds escrowed by the Mortgagee for taxes and hazard insurance constitute a security interest in the Debtor-mortgagor's property excludes the Mortgagee's claim from the scope of 11 U.S.C. § 1322(b)(2). That Code section prevents the "modification," pursuant to 11 U.S.C. § 506(a), of a secured claim which is "secured only by a security interest in real property that is the debtor's residence." Consistent with our own prior decisions in *In re Taras*, 136 B.R. 941, 951 (Bankr.E.D.Pa.1992); and *In re Klein*, 106 B.R. 396, 400 (Bankr.E.D.Pa. 1989), despite subsequent decisions of several other judges of this court to the contrary, we hold that the controlling precedent of *In re Hammond*, 27 F.3d 52, 57 (3d Cir.1994), strongly suggests that such a clause *is* sufficient to avoid the possible application of § 1322(b)(2). We therefore conclude, based upon *Hammond*, that the Debtor may reduce the Mortgagee's secured claim to the value of the Debtor's home at 18 Winthrop Road, Darby, PA 19023 ("the Home"), as of the probable date of confirmation.

However, we find that the value of the Home at this time is $45,000, very close to the figure established by the Mortgagee's expert appraiser, rather than $20,000 to $25,000, as claimed by the Debtor. We will also reduce the Mortgagee's total claim to $66,129.72. Finally, we will require the Debtor to promptly indicate whether he is capable of and intends to file an amended Chapter 13 plan which, adding deferred interest pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), would be sufficiently

funded to pay all allowed secured claims in full.

## B. FACTUAL AND PROCEDURAL HISTORY

JOHN R. REED ("the Debtor") filed the voluntary petition for relief under Chapter 13 of the Bankruptcy Code which underlies the Proceeding on October 14, 1999. On October 28, 1999, NORWEST MORTGAGE, INC. ("the Mortgagee") filed a secured proof of claim itemizing the "total debt" and "arrearages" due on its underlying Mortgage and Note, dated August 27, 1997, as follows:

Total Debt as of: 10/14/1999

| | |
|---|---:|
| Principal Balance | $59,075.33 |
| Interest from Last Paid Installment | $4,264.48 |
| Payment Late Charges | $0.00 |
| Accrued Late Charges | $222.66 |
| Non–Escrow Advances | $3,667.25 |
| Other Unpaid Fees | $0.00 |
| Escrow Advances | $1,585.21 |
| Suspense Balance (*Subtracted) [not further explained] | $0.00 |
| | |
| Total Debt | $68,814.93 |

Total Arrearages as of: 10/14/1999

| | |
|---|---:|
| 1 payments @ $659.98 | $659.98 |
| 9 payments @ $660.92 | $5,948.28 |
| late charges @ [no figure cited] | |
| | |
| Additional Late Charges | $222.66 |
| Escrow Shortage | $199.39 |
| Pre-petition Legal Fees | $1,250.00 |
| Pre-petition Legal Costs | $2,267.25 |
| Additional Charges | $150.00 |
| | |
| Suspense Balance (*Subtracted) [not further explained] | $0.00 |
| | |
| Total Arrearages | $10,697.56 |

On January 5, 2000, the Mortgagee filed a motion ("the Motion") seeking relief from the automatic stay to foreclose on the Home, since it was not receiving current mortgage payments from the Debtor. The Debtor answered prior to the first hearing date on the Motion of January 27, 2000, pointing out that his Chapter 13 plan ("the Plan") contemplated full payment of the Mortgagee's "total debt" claim to the Trustee, thus rendering payments to the Mortgagee unnecessary.

On February 7, 2000, the day prior to a continued hearing on the Motion, the Proceeding, seeking to fix the Mortgagee's total secured claim, was filed. The Complaint sought to reduce the amount of the Mortgagee's secured claim to $20,000, the Debtor's alleged present value of the Home. The Complaint also attacked several of the itemized portions of the proof of claim.

The Proceeding was initially listed for trial on March 23, 2000, the first scheduled date of the confirmation hearing. On that date, the Motion was withdrawn; the trial of the Proceeding was continued to April 12, 2000; and the Confirmation hearing was continued to April 27, 2000. The parties also agreed to file briefs on or before April 7, 2000, prior to trial, addressing the applicability of 11 U.S.C. § 1322(b)(2) to the Proceeding.

The only witnesses at the trial were the Debtor and the Mortgagee's expert appraiser, Joseph A. Singer. It was established through this testimony that the Debtor purchased the Home on August 27, 1997, for a price of $59,700, executing the Mortgage and Note in consideration for a loan to purchase the Home from the Mortgagee's assignor, American Home Funding, Inc. ("American"), in the amount of $59,721.00, with interest at the rate of 7.875% per annum.

As security for this obligation, the Debtor granted American a security interest in the Home. The Mortgage also provided in pertinent part as follows:

**2. Monthly Payment of Taxes, Insurance and Other Charges.** Borrower shall include in each monthly payment, together with the principal and interest set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the property, and (c) premiums for insurance...[T]he

sums paid to Lender are called "Escrow Funds."...

...

The Escrow Funds are pledged as additional security for all sums secured by this Security Installment....

**3. Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

*First,* to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

*Second,* to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

*Third,* to interest due under the Note;

*Fourth,* to amortization of the principal of the Note; and

*Fifth,* to late charges due under the Note....

The Debtor testified that, prior to and for sometime subsequent to his purchase of the Home, he was a maintenance worker for a residential apartment building and therefore had some experience with real estate and the costs of its repair. He testified that the Home, built in 1950, required repairs of $8500 to $9500 to repair the foundation; $8,000 to $10,000 to replace its heater, which he claimed functioned poorly; $2000 to $3000 to replace broken doors; $4500 for plastering; $3000 to $5000 to fix its roof; and $3500 to $4500 to replace its floors. He noted that in Fall, 1999, a flood occurred in an area of Darby borough close to the Home, which resulted in little damage to the Home only because it was situated on high ground. While initially repeatedly testifying that the value of the Home "as is" was $33,000 to $35,000, the Debtor later claimed that he earlier mistakenly cited the Home's value as repaired, and that its value "as is" was in fact only $20,000 to $25,000.

Singer utilized six comparable sales in valuing the Home at $47,000 as of April 7, 2000. While all of his comparables were homes of similar size and vintage in Darby borough, only one property was proximate to the Home and close to the flood area, which sold for $57,500 in May, 1999.

We found Singer's testimony relating to value far more persuasive than that of the Debtor. Specifically, we found that the Debtor had no real basis for designating the repairs necessary to the Home, as the need for same were not borne out by Singer's photographs revealing the Home to in fact be in only slightly poorer condition than the comparable homes. Nor did the Debtor provide any basis, other than his "experience," for his estimates of the costs of the repairs. Nor do we accept his implied analysis that value can be ascertained from the deducting repair costs from a hypothetical "as-repaired" value figure. The Debtor was the same purportedly knowledgeable buyer who paid $59,700 for the Home less then three years before. His reason for repudiating his own prior repeated testimony that the Home was worth as much as $35,000—that he was under medication and confused—was not convincing.

Singer's approach in appraising the Home's value considered much more relevant data, and we find it subject to only minor criticism referenced hereafter. Therefore, we determine that his appraised value figure is far more likely to be accurate than the Debtor's unsupported and varying estimates. Singer's testimony that the Debtor had not, during his appraisal, mentioned most of the repairs which he now recited at trial was more credible than testimony of the Debtor to the contrary.

Nevertheless, Singer conceded that the value of properties in Darby borough is depressed and that the Debtor, while a purportedly knowledgeable buyer, overpaid for the Home. Our only criticism of Singer's valuation testimony is that we find that he failed to take full account of the negative public perception of realty in the borough proximate to the flood area, which would likely depress the value of the Home. Making a slight adjustment for

same, we fix the value of the Home, as of the pertinent time as the likely confirmation date, *see, e.g., In re Jablonski,* 88 B.R. 652, 655 (E.D.Pa.1988); *In re 222 Liberty Associates,* 105 B.R. 798, 801 (Bankr. E.D.Pa.1989); and *In re Winston,* 236 B.R. 167, 171 (Bankr.E.D.Pa.1999), at $45,-000.

## C. DISCUSSION

■ Having resolved the main factual issue of value of the Home in our recitation of the factual history of this matter, we address the main legal issue, whether § 1322(b)(2) bars the utilization of § 506(a) of the Code to bifurcate the Mortgagee's claim into secured and unsecured portions, in this Discussion.

The relevant Code section, 11 U.S.C. § 1322(b)(2), provides in pertinent part as follows:

> (b) Subject to subsections (a) and (c) of this section the plan may—
>
> . . .
>
> (2) modify the rights of holders of secured claims other than a claim secured only by a security interest in real property that is the debtor's principal place of residence. . . .

The question presented is whether the Mortgagee's expressly taking a security interest in the escrow funds as referenced at pages 621–21 *supra* is sufficient to take the mortgage out of the ambit of § 1322(b)(2) and render it exempt from bifurcation under the holdings in *Nobelman v. American Savings Bank,* 508 U.S. 324, 327–32, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

Although *Nobelman* clearly holds that, where a secured claim is subject to § 1322(b)(2), § 506(a) cannot be utilized, the Third Circuit Court of Appeals ("the Ct.App.") has not accorded a broad application to *Nobelman's* holdings. For example, in *In re McDonald,* 205 F.3d 606 (3d Cir.2000), the Ct.App. recently limited the scope of *Nobelman* to claims which are at least in part secured. More important to the case at hand, earlier, *In re Hammond,*

27 F.3d 52, 57 (3d Cir.1994), the Ct.App. reiterated its holding in *Wilson v. Commonwealth Mortgage Corp.,* 895 F.2d 123, 127–28 (3d Cir.1990),

> that section 1322(b)(2)'s language plainly states that a mortgagee who has an additional security interest gets no protection from the antimodification clause of section 1322(b)(2). *Id.* ("The language of section 1322(b)(2) is unambiguous. The language of the bankruptcy judge bears repeating: 'If Commonwealth wishes to otherwise, it should delete such language from its agreements.' "). We also relied on Collier on Bankruptcy to buttress our holding that *creditors who demand additional security interests in personalty or escrow accounts and the like pay a price.* Their claims become subject to modification. Their recourse, if they wish to avoid modification, is to forego the additional security. *Id.* (citing 5 Collier on Bankruptcy ¶ 1322.06 at 1322–14–15) (emphasis added).

Both prior to *Nobelman,* in *Klein, supra,* 106 B.R. at 400, and subsequent to that decision in *Taras, supra,* 136 B.R. at 951, we held that a mortgagee's taking a security interest in hazard insurance proceeds or funds escrowed for that purpose was sufficient to exempt that mortgage from the scope of § 1322(b)(2). Our foresight of the result of *Hammond* in *Taras,* 136 B.R. at 945–52, as well as of both *Hammond* and *McDonald* in *In re Gelletich,* 167 B.R. 370, 374–77, 379 (Bankr. E.D.Pa.1994), and of *In re Johns,* 37 F.3d 1021, 1024–25 (3d Cir.1994), in *In re Bernhardt,* 186 B.R. 889, 890–91 (Bankr. E.D.Pa.1995), encourages us to trust our instincts in this conflict-ridden area of the law. *Cf. id.* at 890; and *Taras,* 136 B.R. at 951 (both holding, and the former citing *Sapos v. Provident Institution of Savings in Town of Boston,* 967 F.2d 918, 925–26 (3d Cir.1992), for the principle that a mortgage's inclusion of a security interest in "rents, issues, and profits" constitutes a

security interest removing the mortgage from the proscriptions of § 1322(b)(2)).

We acknowledge that the statements in *Hammond* addressing security interests in escrow accounts is dictum, because the facts of that case concerned a security interest in household appliances, machinery, furniture, and equipment. 27 F.3d at 52–53. However, we believe that we should follow the dictum of the Ct.App. as that court itself thusly states in *McDonald, supra*, 205 F.3d at 612–13, it must follow the dictum of the Supreme Court in *Nobelman:*

> we should not idly ignore considered statements the Supreme Court makes in dicta. The Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket. "Appellate courts that dismiss these expressions [in dicta] and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and frustrate the even-handed administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there." *United States v. Bloom*, 149 F.3d 649, 653 (7th Cir.1998).

We therefore believe that *Hammond* can logically be read as holding that a mortgagee's taking of a security interest in any personal property, and especially in sums escrowed for taxes, excludes a mortgage from the scope of § 1322(b)(2).

We note that Collier thusly agrees with our reading of *Hammond* as constituting a holding that a mortgagee's taking of *any* additional security in mortgage documents results in an exception from the conclusion reached in *Nobelman*, 8 COLLIER ON BANKRUPTCY, ¶ 1322.06[1][a], at 1322-22 to 1322-24 (15th ed. rev.1999):

> As the Court of Appeals for the Third Circuit held in *In re Hammond*, a case decided after *Nobelman*, a claim secured by any other real property or by personal property of the estate or of the debtor, or by the property of another may be

modified by the chapter 13 plan. Creditors sometimes demand real property and personal property to secure the same debt. Even purchase money mortgages often take additional security interests in appliances, furniture and other personalty. Other creditors may have security interests in other real property, rents and profits, *escrow accounts*, bank accounts, motor vehicles or *insurance proceeds and premium refunds*. Still others require other entities to give security interests in their property to secure a debtor's mortgage loan. The *Hammond* court held that *all* such claims may be modified by a chapter 13 plan, notwithstanding the creditor's argument that the Supreme Court had ruled to the contrary in *Nobelman* because the lienholder in *Nobelman* had in fact retained other security (an issue never addressed by the Supreme Court). (footnotes omitted and emphasis is added).

We acknowledge authority to the contrary outside of this Circuit, *e.g., In re Davis*, 989 F.2d 208, 211–12 (6th Cir.1993); *In re Washington*, 967 F.2d 173, 174–76 (5th Cir.1992); and *In re Halperin*, 170 B.R. 500, 501–02 (Bankr.D.Conn.1994), and in decisions of other judges in this district, *In re Abruzzo*, 245 B.R. 201, 208–09 (Bankr.E.D.Pa.1999), *rev'd in part and remanded*, C.A. No. 99–6499, 2000 WL 420635 (E.D. Pa. April 10, 2000) (SIGMUND, J.); *In re Boehmer*, 240 B.R. 837, 839–40 (Bankr.E.D.Pa.1999) (RASLAVICH, J.); *In re Hackling*, 231 B.R. 590, 591–92 (Bankr.E.D.Pa.1999) (TWARDOWSKI, J.); *In re Rodriguez*, 218 B.R. 764, 774–77 (Bankr.E.D.Pa.1998) (RASLAVICH, J.), as well as elsewhere in the Circuit. *See In re Rosen*, 208 B.R. 345, 349–50 (D.N.J.1997). We regret the fact that a difference between the legal consequences of a particular factual situation depends on the assigned judge in this jurisdiction. However, we consider it more important to be consistent with our own earlier decisions until same are proven inconsistent with Third Circuit law.

We also note a substantial number of decisions consistent with our result, including decisions in this district by the present Chief Judge of the Western District of Pennsylvania, Judith K. Fitzgerald, while visiting in this jurisdiction, *see In re Steslow,* 225 B.R. 883, 885–86 (Bankr.E.D.Pa. 1998); and *In re Lewandowski,* 219 B.R. 99, 102 (Bankr.E.D.Pa.1998), at least when, as here, an express security interest is taken in mortgage hazard insurance. *But see In re Cupp,* 229 B.R. 662, 664–65 (Bankr.W.D.Pa.1999); and *In re Crystian,* 197 B.R. 803, 805–06 (Bankr.W.D.Pa. 1996)(Judge Fitzgerald holds that the presence of credit life and disability insurance or hazard insurance, without a security interest in favor of the mortgagee, were insufficient to take mortgage loan transactions out of § 1322(b)(2)). We also note that the decisions in *Transouth Financial Corp. v. Hill,* 106 B.R. 145, 146–47 (W.D.Tenn.1989); *In re Jones,* 201 B.R. 371, 374–76 (Bankr.D.N.J.1996); *In re Dent,* 130 B.R. 623, 629 (Bankr.S.D.Ga. 1991); *In re Selman,* 120 B.R. 576, 578–79 (Bankr.D.N.M.1990); *In re Wilson,* 91 B.R. 74, 76 (Bankr.W.D.Mo.1988); and *In re Stiles,* 74 B.R. 708, 710 (Bankr.N.D.Ala. 1987), are consistent with our result.

We therefore conclude that § 1322(b)(2), as interpreted by *Nobelman,* does not preclude the relief sought by the Debtor, *i.e.,* bifurcation of the Mortgagee's claim, in light of the subsequent Ct.App. decision in *Hammond.* The Debtor may therefore prepare a plan which pays the Mortgagee its allowed secured claim of $45,000, plus deferral interest, *see Klein, supra,* 106 B.R. at 402, at the contract rate of 7.875% or some other market rate proven more appropriate. *See General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 70–71 (3d Cir.1993).

■ The only issue remaining—and it is one to which the parties devoted little attention because they recognized that it was relatively insignificant—is fixing the amount of the Mortgagee's total secured claim in order that we can determine the amount of the valid unsecured portion of the Mortgagee's claim against the Debtor. The Mortgagee did not dispute our suggestion that the "Non–Escrow Advances" portion of its total debt, *see* page 620 *supra,* could be reduced by the $150 vague "Additional Charges" portion of same, *see id.,* as the purpose for these charges was unproven; or our reduction of the "Prepetition Legal Fees" portion, *see id.,* by $950 to the $300 legal fee allowance to which we have generally limited a mortgagee to assessing against a debtor under 11 U.S.C. § 506(b) for obtaining a prepetition mortgage foreclosure judgment and execution. *See In re Giordano,* 234 B.R. 645, 651, *reconsideration denied,* 1999 WL 527717 (Bankr.E.D.Pa. July 20, 1999), and cases cited therein.

We are also inclined to strike the "Escrow Advances" of $1585.21, *see* page 620 *supra,* as there is no evidence that same were not incurred by the Mortgagee after its foreclosure judgment was taken. *See In re Stendardo,* 991 F.2d 1089, 1094–1101 (3d Cir.1993) (mortgagee not entitled to post-judgment expenditures for taxes and insurances); and *Giordano, supra,* 234 B.R. at 651 (when the claimant offers no basis to ascertain the allowability of a certain item of a claim, it will be disallowed unless the objector admits same is reasonable).

Our recollection is that these charges, totaling $2685.21, were the only items ultimately contested as unreasonable by the Debtor. The Mortgagee's total debt claim is therefore fixed at $66,129.72, $45,000 of which is determined to be secured and the balance of $21,129.72 of which is deemed to be unsecured.

Our observation of the Plan reveals that it is only funded in the total amount of $26,985.60. This figure is obviously insufficient in light the Debtor's obligation to fund the Mortgagee's allowed secured claim of $45,000 plus deferral interest, which, at the contract rate, adds approximately $10,000 more. We will discuss the issue of plan feasibility in light of this

decision at the forthcoming continued confirmation hearing of April 27, 2000.

*D. CONCLUSION*

An order consistent with our foregoing conclusions will be entered.