In re Ronald J. GRONSKI, Debtor.

Bankruptcy No. 85–04610K.

United States Bankruptcy Court,
E.D. Pennsylvania.

May 20, 1988.
As Amended May 24, 1988.

Jack K. Miller, Philadelphia, Pa., for debtor.

Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa., for the U.S.

Kevin Murphy, PHEAA, Harrisburg, Pa., for PHEAA.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

At issue at present in the instant case, in which we previously issued one of our earliest Opinions, published at 65 B.R. 932, is a Joint Motion by the United States of America (hereinafter referred to as "USA") and the Pennsylvania Higher Education Assistance Agency (hereinafter "PHEAA") seeking to modify the Debtor's plan, confirmed on December 4, 1986, pursuant to 11 U.S.C. § 1329(a). We hold that a substantial change in a debtor's circumstances is needed to provide relief to creditors under § 1329(a). However, our belief that this Debtor has attempted to deceive the court in reciting his actual expenses, both at the time of Confirmation and at present, causes us to conclude that the Debtor's expenses have declined in sufficient amount since Confirmation to warrant a $115.00 monthly increase in plan payments to $200.00 monthly.

In our previous Opinion, we denied an Objection of the USA to Confirmation of the Debtor's Plan. The Objection was based on the fear of the USA that the Debtor was attempting to discharge an obligation under the Health Education Assistance Loan (hereinafter "HEAL") Program, 42 U.S.C. § 294f, et seq., in his Chapter 13 Plan. We dispelled this fear of the USA by concluding that a HEAL obligation could be discharged only if the requirements of 42 U.S.C. § 294f(g) were met. *Accord, In*

*re Johnson,* 787 F.2d 1179 (7th Cir.1986); *In re Green,* 82 B.R. 955 (Bankr.N.D.Ill. 1988); *In re Cleveland,* 64 B.R. 810 (Bankr.S.D.Cal.1986); and *In re Hines,* 63 B.R. 731 (Bankr.D.S.D.1986). *Contra: In re Lee,* 71 B.R. 833 (Bankr.N.D.Ga.1987), *rev'd,* C.A. Nos. C–87–702A to C–87–706A (N.D.Ga. July 23, 1987).[1]

In the course of that previous Opinion, we stated that the Debtor was earning but $7,000.00 annually, and appeared to be a good candidate for receiving a discharge under 42 U.S.C. § 294f(g). 65 B.R. at 936–37. We also pointed out that, if the Debtor's financial circumstances changed, any creditor, including the USA, could file a motion requesting that the plan be modified under a 1984 Amendment to § 1329(a). *Id.* at 937.

On March 24, 1988, after taking the Debtor's examination pursuant to Bankruptcy Rule 2004, the USA, joined by PHEAA, did in fact file such a motion, requesting that the Debtor's plan payments be ordered increased from $85.00 monthly to $285.00 monthly. The Debtor's confirmed Modified Plan, calling for payments of $85.00 monthly, contained a provision stating that, in the event of an increase in the Debtor's income of at least twenty (20%) percent, the Plan should be further modified. The Debtor resisted the instant Motion on the ground that any increases in his income had been by less than twenty (20%) percent.

A hearing, at which the Debtor was the sole witness, was conducted on April 20, 1988. At the close of the hearing, we allowed the Debtor permission to respond to a previously-filed joint Brief of the USA and PHEAA, and gave the Movants an opportunity to counter-reply. All Briefs were in our hands by May 9, 1988.

---

1. This statutory provision reads as follows:

Discharge in bankruptcy; release of debt

(g) A debt which is a loan insured under the authority of this subpart may be released by a discharge in bankruptcy under Title 11 only if such discharge is granted—

(1) after the expiration of the 5–year period beginning on the first date, as specified in subparagraphs (B) and (C) of section 294d(a)(2) of this title, when repayment of such loan is required;

(2) upon a finding by the Bankruptcy Court that the nondischarge of such debt would be unconscionable; and

(3) upon the condition that the Secretary shall not have waived the Secretary's rights to apply subsection (f) of this section to the borrower and the discharged debt.

The starting point for our factual analysis is examination of the Debtor's Chapter 13 Statement of income and expenditures and Plan. Testimony adduced from the Debtor revealed that we had misread the statement of his annual income in drafting our previous Opinion when we designated his income, at that time, as $7,000.00 annually. 65 B.R. at 937. In fact, this was the designation of income "for last calendar year," i.e., 1984. In 1985, when the petition was filed, he was working regularly as a counsellor in a home providing community living arrangements for retarded persons. His gross income, by the date of filing, had risen to about $1,300.00 monthly, or about $15,600.00 annually in 1985. At that time, his net monthly income was recited as $955.00 and his expenses as $870.00, leaving the $85.00 balance which he proposed to pay into the Plan. His expenses were broken down as follows:

| | |
|---|---|
| Rent | $330.00 |
| Electric | 25.00 |
| Telephone | 35.00 |
| Food | 200.00 |
| Clothing | 50.00 |
| Laundry & Cleaning | 30.00 |
| Newspapers, Books, Magazines | 20.00 |
| Doctor, Dentist | 25.00 |
| Transportation | 90.00 |
| Recreation | 30.00 |
| Auto Insurance | 35.00 |
| | $870.00 |

None of these expenses appeared to be out of line. The Modified Plan also contained the following provision the addition of which, ironically, had apparently caused PHEAA to withdraw an Objection which it had filed prior to Confirmation:

In the event that debtor's gross monthly income changes by an amount in excess of 20% in any one year period during the duration of the plan, a party in interest may request a hearing to determine whether, and to what extent, debtor's plan should again be modified.

There being no Objections to confirmation other than that of the USA, which we denied in our Opinion, and the Plan appearing realistic, we confirmed it in an Order filed December 4, 1986.

The Debtor testified at the April 20, 1988, hearing that his income had increased to $18,704.45 in 1986 due to his working overtime in his agency, but had fallen to $16,603.85 in 1987, when he spent part of the year doing the same type of work for another agency before returning to his prior employer. His projected gross earnings for 1988 were $16,931.00.

The only substantial change in the Debtor's life which affected his expenses was his moving from his residence at the time of filing, where the rent had risen to $345.00, in April, 1987. At present, his rent is only $225.00 monthly, and his $25.00 monthly electric bill at his previous residence was eliminated because his present rent includes all utilities except telephone.

All of the foregoing sounds rather unremarkable. However, what *was not* unremarkable was the Debtor's testimony that he purchased a certificate of deposit on November 12, 1987, in the amount of $3,043.13 with savings which he had amassed since the filing of his bankruptcy. Also, his personal savings account balance increased from approximately $1,000.00 at the time of filing to approximately $2,000.00 at present. Thus, the Debtor was able to save over $4,000.00 between the date that he filed bankruptcy on October 30, 1985, and November, 1987, an amount in excess of $160.00 monthly. The Debtor attempted to justify this by claiming that he worked substantial overtime in 1986, received a lump-sum payment of some amount in excess of $500.00 in lieu of taking a vacation, and lived a Spartan existence in this period. We are unimpressed with these explanations. In this period, his largest fixed expenditure, i.e., his rent, was considerably higher than at present. We conclude that, plainly and simply, the Debtor misstated, probably intentionally, his actual monthly expenditures in his previous filings.

Despite this development and the reduction of his expenses for rent, the Debtor attempted to pass off to us a budget indicating that he had less than $85.00 disposable monthly income at present. His monthly net income was identified as $1,054.00.

His monthly expenses were recited as follows:

| | | |
|---|---|---|
| Rent | | $225.00 |
| Food | | 220.00 |
| Clothing | | 50.00 |
| Non–Food | | 65.00 |
| Telephone | | 25.00 |
| Laundry & Cleaning | | 35.00 |
| Newspapers & Books | | 20.00 |
| Medical Expenses | | 25.00 |
| Transportation: | | |
| Gas | $65.00 | |
| Oil Changes | 20.00 | |
| Repairs | 25.00 | |
| Parking | 4.00 | |
| Registration | 2.00 | |
| Inspection | 1.25 | 117.25 |
| Auto Insurance | | 62.00 |
| Recreation | | 50.00 |
| Union Dues | | 21.00 |
| Cigarettes | | 40.00 |
| Barber | | 24.00 |
| TOTAL | | $969.25 |

One further development undermined our confidence in the Debtor's integrity. Between the time of his Rule 2004 examination by the Movants on March 23, 1988, and the date of the hearing on April 20, 1988, the Debtor had liquidated the certificate of deposit by "purchasing" a 1986 automobile from his mother, of which she had given him the use in the past year prior to the purchase, for $1,500.00, and paying $1,500.00 to one Bonnie Thatcher to purchase "furniture." No receipts verifying, nor testimony supporting a need for, either of these recent purchases was produced.

We are forced to conclude that these "purchases" were pathetically transparent transactions in the nature of fraudulent conveyances to attempt to avoid the perceived danger of losing the certificate of deposit. This action, as well as the mysterious saving and the obvious attempt to inflate the Debtor's actual expenditures for "non-food," "auto expenses," and "barber," expenditures, have totally undermined our confidence in the Debtor as a credible person and an honest debtor. Hopefully, this is an isolated instance of such abuse of the bankruptcy system. However, this moral indictment of the Debtor does not resolve the legal rights of the parties.

The Code provision invoked by the USA and PHEAA is 11 U.S.C. § 1329(a), which was amended in 1984 to read as follows:

§ 1329. Modification of plan after confirmation

(a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—

(1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;

(2) extend or reduce the time for such payments, or

(3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan....

Prior to 1984, post-confirmation modification of a Chapter 13 plan pursuant to § 1329(a) could be effected only by a Debtor. *See, e.g., In re Tschiderer,* 73 B.R. 133, 134–35 (Bankr.N.D.Tex.1987); *In re Boone,* 53 B.R. 78, 79–80 (Bankr.E.D.Va.1985); and 5 COLLIER ON BANKRUPTCY, ¶ 1329.01[1][b], at 1329–4 (15th ed. 1987). An interested party was limited, in his efforts to modify payments upward, to utilization of 11 U.S.C. § 1330 to revoke confirmation or one of several other procedural tools which were generally available to creditors in only extraordinary situations. *See In re Moseley,* 74 B.R. 791, 798 (Bankr. C.D.Cal.1987). *But see In re Koonce,* 54 B.R. 643 (Bankr.D.S.C.1985) (trustee allowed to modify plan to effect a one hundred (100%) percent payment to creditors after debtor won approximately $1,300,-000.00 in a state lottery).

Any attempt by creditors to modify a debtor's plan post-confirmation is confronted, to at least some degree, by the principle that a confirmation order is *res judicata* of the rights of the debtor vis-a-vis the creditors provided for under the plan. *See, e.g.,* 11 U.S.C. § 1327(a); *In re Bonanno,* 78

B.R. 52, 55–56 (Bankr.E.D.Pa.1987); *In re Brown,* 76 B.R. 1013, 1014–15 (Bankr.E.D. Pa.1987); *In re Young,* 76 B.R. 504, 506–07 (Bankr.E.D.Pa.1987); and *In re Flick,* 14 B.R. 912, 918 (Bankr.E.D.Pa.1981). Therefore, unless a creditor is able to show evidence of a change in the debtor's circumstances arising subsequent to confirmation, a motion under § 1329(a) cannot succeed. *See Moseley, supra,* 74 B.R. at 791; and *In re Toth,* 61 B.R. 160, 164–67 (Bankr.N.D. Ill.1986). Collier therefore states, and we think accurately, that the amendment to § 1329(a) only allows modifications of plan payments at the request of parties other than the debtor "in response to changes in the debtor's circumstances which *substantially* affect the ability to make future payments (emphasis added)." 5 COLLIER, *supra,* ¶ 1329.01[1][b], at 1329–4.

■ We digress momentarily to discuss two related points. First, the power of a debtor to request post-confirmation amendments is much broader than that of a creditor. *See In re Evans,* 66 B.R. 506, 511 (Bankr.E.D.Pa.1986), *aff'd,* 77 B.R. 457, 459–60 (E.D.Pa.1987); and 5 COLLIER, *supra,* ¶ 1329.01[1][a], at 1329–2 to 1329–3. Nevertheless, the *res judicata* impact of § 1327(a) is, at least to some degree, a two-way street. *Compare Young, supra, with Brown, supra.*

■ Secondly, we do not believe that creditors' rights to proceed under § 1329(a) can be modified by a plan provision purported to contain them, as in the provision in the Debtor's plan allowing modification only if the Debtor's monthly income increases by twenty (20%) percent. Confirmation of a plan including provisions which are contrary to the Code or other applicable law cannot protect a debtor. *Bonanno, supra,* 78 B.R. at 56–57; and *In re Gurst,* 76 B.R. 985, 989–91 (Bankr.E.D.Pa.1987).

We note that case law interpreting § 1329(a), as amended in 1984, is sparse.

The only reported case that we located where a non-debtor filing a motion under this provision, as amended, was successful was *In re Euerle,* 70 B.R. 72, 73 (Bankr.D. N.H.1987), where the debtor had obtained a post-petition net inheritance of $300,000.00. *But see Koonce, supra* (court allowed trustee's motion despite apparent pre–1984 amendment prohibition on such a motion on very compelling facts (lottery winnings)).

■ We must now apply the foregoing legal principles to the facts at hand. We disagree with the Movants insofar as they suggest that the Debtor's modest income increments, in themselves, constitute a basis for post-confirmation modification of the Debtor's plan, even if we discount, as we must, the plan provision purported to create a requirement that an income increment be in the amount of at least twenty (20%) percent to permit a modification on this basis. We also decline to allow any modification solely on the ground that the Debtor apparently intentionally understated his expenses in 1985, allowing him to save $4,000.00 over and above his expenses in about two years.[2]

■ However, the Debtor's decrease in rent and electric service costs from effectively $355.00 monthly, which had risen to $370.00 by April, 1987, to $225.00 monthly is, we believe, a substantial change in the Debtor's financial circumstances. The Debtor's lack of credibility becomes important when we assess his present claims of expenses. The items for "non-food," "auto expenses," and "barber" are obviously excessive and the "cigarettes" expense is a new addition. Having been, we believe, deceived in 1985 by this Debtor, we have, through experience, become wiser. We shall therefore require the Debtor to increase his monthly payments to $200.00 monthly, effective April, 1988, an increment of $115.00 monthly. Under the circumstances, this is a modest adjustment compared to some other alternatives open

**2.** It is doubtful that the Movants are likely to cease their efforts at scrutinizing the financial status and conduct of the Debtor at this point. Having had his credibility destroyed in our eyes, the Debtor has severely undermined his prospects of showing that dischargeability of his

HEAL loan would be "unconscionable." *See* page 429 n. 1 *supra,* 42 U.S.C. § 294f(g)(2). *Compare* our previous Opinion, 65 B.R. at 936, *with Green, supra,* 82 B.R. at 858–59, as to the requirement of 42 U.S.C. § 294f(g)(1).

to us which we have decided to forego. See 18 U.S.C. §§ 152, 3057.

We emphasize that our decision is not merely a difference of opinion between the Debtor and us regarding a value judgment of the propriety of his expenditures. *Compare In re Navarro*, 83 B.R. 348 (Bankr.E.D.Pa.1988) (expenditures for legitimate religious contributions of $260.00 monthly and private education of a child at $220.00 monthly allowed in consideration of objections to confirmation of debtors' Chapter 13 plan under 11 U.S.C. § 1325(b)(1)(B)); and *In re Latimer*, 82 B.R. 354, 357–58 (Bankr.E.D.Pa.1988) (Chapter 7 debtors' expenditures for cleaning clothes at $200.00 monthly, private education of children at $620.00 monthly, and renting a Mercedes automobile and incurring transportation expenses of $592.00 monthly, while found to be excessive, were held to be an insufficient basis for dismissal under 11 U.S.C. § 707(a)). It is the Debtor's dishonesty about his expenditures and his financial dealings which troubles us. The Debtors in *Navarro* and *Latimer* were deemed credible by the court.

An Order granting the joint motion in part will therefore be entered by us.